FILED by ___ D.C.

ELECTRONIC

**FEB 19, 2009**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

# 09-60043-CR-MARRA/HOPKINS

CASE NO. _____

18 U.S.C. § 1349
18 U.S.C. § 982
21 U.S.C. § 853
28 U.S.C. § 2461

UNITED STATES OF AMERICA

vs.

CAROL ARONOWITZ,

                    Defendant.
_____/

# INDICTMENT

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At various times relevant to this Indictment:

1.      Nationwide Cyber Systems ("Nationwide") was a Florida corporation with its principal place of business in Broward County at 6030 Hollywood Boulevard, Hollywood, Florida, from on or about April 2002 through on or about May 2004.

2.      Nationwide engaged in the sale of business opportunities to the public. The firm purported to sell Internet kiosks, along with assistance in establishing, maintaining, and operating an Internet kiosk business. According to the firm's sales pitch, business opportunity purchasers would place their Internet kiosks in hotels, airports and other high-traffic locations. The purchasers purportedly would earn substantial profits when members of the public used the kiosks for a fee.

3.       Nationwide salespeople corroborated their sales claims by referring potential purchasers to individuals who claimed to own and operate profitable Nationwide Internet kiosks. Defendant **CAROL ARONOWITZ** falsely held herself out to potential Nationwide business opportunity purchasers as an independent reference for Nationwide whose business opportunity earned her substantial profits.

## COUNT 1
### Conspiracy to Commit Mail and Wire Fraud
### (18 U.S.C. § 1349)

1.       Paragraphs 1 through 3 of the General Allegations section of this Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.       From in or about June 2002 through in or about July 2003, in Broward County, in the Southern District of Florida, and elsewhere, the defendant,

### CAROL ARONOWITZ,

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate and agree with others, known and unknown to the Grand Jury, to commit certain offenses against the United States, that is:

(a) to knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and knowingly cause to be delivered certain mail matter by a private and commercial interstate carrier, according to the directions thereon, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1341;

2

(b) to knowingly and with intent to defraud devise and intend to devise a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and knowingly transmitting and causing to be transmitted certain wire communications in interstate commerce, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1343.

## PURPOSE OF THE CONSPIRACY

3.      It was the purpose of the conspiracy for **CAROL ARONOWITZ** and her co-conspirators to unlawfully enrich themselves by obtaining money from potential business opportunity purchasers by making materially false representations, and omitting to state and concealing material facts concerning, among other things, expected profits, the services provided to purchasers, and the authenticity of Nationwide references.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which **CAROL ARONOWITZ** and her co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among others, the following:

4.      On or about December 10, 2001, the defendant's co-conspirator, Paul Pemberton ("Pemberton"), caused the incorporation of Nationwide.  While Pemberton installed another individual as the firm's president, he controlled its operations.

5.      From on or about December 5, 2001, through on or about January 31, 2002, a substantial part of the start-up funding for Nationwide came from a jointly held bank account on which **CAROL ARONOWITZ** was an account holder, using a series of electronic interstate bank transfers to invest a total of $50,000 in the company.

3

6.      In or about April 2002, Nationwide began offering its business opportunities to the public by placing advertisements on television, on the Internet, and in other media across the country. The advertisements touted the huge and easy profits that purchasers purportedly could earn by purchasing a Nationwide business opportunity, and urged potential purchasers to call a telephone number that appeared in the advertisements.

7.      Potential purchasers who responded to Nationwide's advertisements were placed in touch with salespeople.  The salespeople explained that, for an investment of roughly $10,000 to $15,000, a purchaser would receive an Internet kiosk, and the kiosk would be placed in a location in the purchaser's geographic area and provide Internet service, among other services, to the public for a fee. The kiosk would also feature national and local advertising. The Nationwide purchaser would collect commissions based upon kiosk use and advertising revenue.

8.      Nationwide salespeople provided potential purchasers with the names of references. **CAROL ARONOWITZ** was one such reference.  In interstate telephone calls, the references, including **CAROL ARONOWITZ**, falsely claimed to be successful Nationwide business opportunity purchasers, and vouched for the support and assistance that Nationwide provided.

9.      The defendant's co-conspirators sent potential purchasers via commercial interstate carrier professional-looking, glossy brochures and a promotional infomercial on DVD or videotape touting the huge earnings that could supposedly be made from the Nationwide business opportunity. Like Nationwide's salespeople and references, the brochures and infomercials induced potential purchasers to believe that Nationwide provided a profitable business to purchasers.

10.      Nationwide salespeople made a number of false representations about the Nationwide business opportunity, earnings projections, earnings of prior purchasers, and the help and support

4

Nationwide provided. Once purchasers agreed to make a purchase, salespeople instructed the purchaser to fill out a purchase order and send it back to Nationwide, along with payment for the business opportunity. Payments were made by check sent via commercial interstate carrier and United States Postal Service, and by bank wire.

11. To fraudulently induce others to purchase business opportunities, **CAROL ARONOWITZ** and her co-conspirators made, and caused others to make, numerous materially false statements to potential investors and concealed and omitted to state material facts, including, among others, the following:

### Materially False Statements

(a) That Nationwide would find appropriate, viable, and highly profitable locations to place the Internet kiosks it sold and that virtually every shopping mall, hotel, and store owner wanted one, when, in truth and in fact, Nationwide locators had a difficult time finding locations that accepted their kiosks, locations typically were not appropriate, viable, or highly profitable, and the locators would place the kiosk in any location that would accept it;

(b) That **CAROL ARONOWITZ** had purchased an Internet kiosk from Nationwide when, in truth and in fact, she received a machine from the company, as well as a subsequent replacement kiosk, at no cost;

(c) That **CAROL ARONOWITZ** owned a highly profitable Nationwide business opportunity, when, in truth and in fact, the defendant's Internet kiosk was earning very small amounts of money;

(d) That, from on or about June 20, 2002, through mid-September 2002, **CAROL ARONOWITZ** had one or more Internet kiosks that were placed in locations, operating and earning

5

a profit when, in truth and in fact, the one machine that she did own was not placed or set up during that time period, and therefore was not earning any money;

(e)     That **CAROL ARONOWITZ** owned more than one Internet kiosk when, in truth and in fact, at no time did she own or operate more than one Internet kiosk;

(f)     That **CAROL ARONOWITZ** owned and operated a Nationwide Internet kiosk that was located in a mall and an airport when, in truth and in fact, that was not the case;

## Omissions and Concealment of Material Facts

(g)     That **CAROL ARONOWITZ** was not in the same position as the typical Nationwide investor in that she received her Internet kiosk for free;

(h)     That, once her machine was placed, **CAROL ARONOWITZ's** Internet kiosk frequently was either partly or entirely out of service;

(i)     That **CAROL ARONOWITZ** was being paid $20 per caller for each reference call she took;

(j)     That **CAROL ARONOWITZ** was friends with a Nationwide principal and a substantial investment in Nationwide had come from a bank account jointly held by **CAROL ARONOWITZ** and another person;

(k)     That during the months she acted as a reference, at least monthly profit-share checks for tens of thousands of dollars were deposited into a bank account jointly held by **CAROL ARONOWITZ** and another person, and that these payments were derived from Nationwide's monthly income, giving **CAROL ARONOWITZ** a vested interest in whether or not the callers with whom she spoke decided to purchase; and

6

(l)     That during many of the months in which she was a reference, the monthly payments for two of **CAROL ARONOWITZ**'s family automobiles were being made by Nationwide.

## OVERT ACTS

In furtherance of the conspiracy and to achieve the objects and purpose thereof, the co-conspirators committed, and caused to be committed, in the Southern District of Florida and elsewhere, the following overt acts, among others:

1.     On or about December 5, 2001, **CAROL ARONOWITZ** and a co-conspirator caused the transfer of $20,000 from an Ohio bank account jointly held by **CAROL ARONOWITZ** and another person to the bank account of Pemberton Consulting – the S Corporation run by Nationwide founder Paul Pemberton and another individual – in the Southern District of Florida.

2.     In or around December 2001, **CAROL ARONOWITZ** and a co-conspirator caused the transfer of $15,000 from an Ohio bank account jointly held by **CAROL ARONOWITZ** and another person to the bank account of Pemberton Consulting – the S Corporation run by Nationwide founder Paul Pemberton and another individual – in the Southern District of Florida.

3.     On or about January 31, 2002, **CAROL ARONOWITZ** and a co-conspirator caused the transfer of $15,000 from an Ohio bank account jointly held by **CAROL ARONOWITZ** and another person to a Nationwide bank account in the Southern District of Florida.

4.     On or about June 20, 2002, **CAROL ARONOWITZ** reported by interstate telephone call to Nationwide in the Southern District of Florida that she had spoken with potential purchaser S.G. and he had expressed interest in purchasing two to five Internet kiosks.

7

5.      On or about June 25, 2002, **CAROL ARONOWITZ** reported by interstate telephone call to Nationwide in the Southern District of Florida that she had spoken with potential purchaser M.M. and that he had expressed interest in purchasing Internet kiosks.

6.      On or about July 8, 2002, **CAROL ARONOWITZ** and her co-conspirators caused a Nationwide check in the amount of $12,500 to be deposited into a bank account jointly held by **CAROL ARONOWITZ** and another person.

7.      In on or about July 2002, **CAROL ARONOWITZ** had an interstate telephone conversation with potential purchaser R.W., during which she told R.W. that she had multiple Internet kiosks in place and operating, earning an average of approximately $350 per month per kiosk.

8.      In or around September 2002, a co-conspirator caused an investment check from R.W. in the amount of $9,975 to be deposited in Nationwide's bank account in the Southern District of Florida.

9.      On or about July 23, 2003, a co-conspirator in the Southern District of Florida caused an Internet kiosk to be delivered to **CAROL ARONOWITZ.**

10.     In or about July 2002, **CAROL ARONOWITZ** had an interstate telephone conversation with potential purchaser G.B., during which she told G.B. that she was earning close to $1,000 per month on each of her Internet kiosks.

11.     In or around September 2002, a co-conspirator caused an investment check from G.B. in the amount of $29,985 to be deposited in Nationwide's bank account in the Southern District of Florida.

12.     On or about September 9, 2002, **CAROL ARONOWITZ** signed a "Location Agreement" to have her Internet kiosk thereafter placed at the Holiday Inn City Center in Columbus, Ohio.

13.     On or about September 14, 2002, **CAROL ARONOWITZ** had an interstate telephone conversation with potential purchaser T.G., during which she told T.G. that she had five machines, and they were up and running, and doing very well.

14.     In or around September 2002, a co-conspirator caused an investment check from T.G. in the amount of $25,990 to be deposited in Nationwide's bank account in the Southern District of Florida.

15.     In or around October 2002, **CAROL ARONOWITZ** had an interstate telephone conversation with potential purchaser G.C., during which she told G.C. that she had one Internet kiosk in a mall and another in an airport, and was earning more that $1,000 per month from the kiosks.

16.     On or about October 28, 2002, a co-conspirator caused an investment check from G.C. in the amount of $24,990 to be deposited in Nationwide's bank account in the Southern District of Florida.

17.     On or about October 7, 2002, **CAROL ARONOWITZ** contacted Nationwide demanding that Nationwide pay for one month of her Internet connection fees in the amount of $314.11.

18.     On or about October 22, 2002, **CAROL ARONOWITZ** reported by interstate telephone call to Nationwide in the Southern District of Florida that she took a telephone call from potential purchaser M.C. and that he was interested in purchasing in Internet kiosk.

9

19.     In or around October 2002, **CAROL ARONOWITZ** had in interstate telephone conversation with potential purchaser C.E., during which she told C.E. that she had five Internet kiosks, two of which were placed – one in a hotel and another in an airport, and she was averaging $1,000 per month in earnings from each of the two Internet kiosks.

20.     On or about November 6, 2002, **CAROL ARONOWITZ** contacted Nationwide demanding that Nationwide pay for one month of her Internet connection fee in the amount of $314.11.

21.     On or about November 19, 2002, a co-conspirator caused an investment check from C.E. in the amount of $94,950 to be deposited in Nationwide's bank account in the Southern District of Florida.

22.     In or about November 2002, **CAROL ARONOWITZ** had an interstate telephone conversation with potential purchaser M.K., during which she told M.K. that she had placed her first Internet kiosk within 30 days of receiving it, and she was earning several hundred dollars per month from it, and that she had several others that she was working on placing in an airport.

23.     On or about November 20, 2002, a co-conspirator caused an investment check from M.K. in the amount of $1500 to be deposited in Nationwide's bank account in the Southern District of Florida.

24.     On or about December 13, 2002, **CAROL ARONOWITZ** faxed a note from Ohio to Nationwide in the Southern District of Florida, demanding that Nationwide reimburse her for $300 of her cell phone bill because 'the majority of the bill were calls to [the Nationwide information technology director] . . . trying to get my machine hooked up."

25.     On or about January 7, 2003, **CAROL ARONOWITZ** and her co-conspirators caused Nationwide checks in the amount of $37,500 and $620 to be deposited into a bank account jointly held by **CAROL ARONOWITZ** and another person.

26.     On or about January 9, 2003, **CAROL ARONOWITZ** had an interstate telephone conversation with potential purchaser C.P., during which she told C.P. that she had two Internet kiosks placed in airports, and was averaging $800 to $1,000 per month in earnings from each of those two Internet kiosks.

27.     On or about January 20, 2003, a co-conspirator caused an investment check from C.P. in the amount of $14,995 to be deposited in Nationwide's bank account in the Southern District of Florida.

28.     On or about February 6, 2003, **CAROL ARONOWITZ** and her co-conspirators caused a Fed Ex package to be sent from Hollywood, Florida, to the home of **CAROL ARONOWITZ** in Columbus, Ohio, containing a check for $3,708.50 to cover two months of payments for a Volvo and a Mercedes Benz belonging to **CAROL ARONOWITZ** and another person.

29.     On or about February 19, 2003, **CAROL ARONOWITZ** had an interstate telephone conversation with potential purchaser J.C., during which she told J.C. that she had one Internet kiosk at a hotel and was making just under $800 per month, and it would take her 1½ years to recoup her investment.

30.     On or about June 24, 2003, a co-conspirator caused an investment check from J.C. in the amount of $27,990 to be deposited in Nationwide's bank account in the Southern District of Florida.

31.     On or about March 27, 2003, **CAROL ARONOWITZ** had an interstate telephone conversation with potential purchaser T.J., during which she told T.J. that she had one Internet kiosk, that it was placed in a hotel, and after initially earning an average of $600 to $800 per month, it was now averaging $1,000 per month.

32.     On or about March 31, 2003, a co-conspirator caused an investment check from T.J. in the amount of $14,995 to be deposited in Nationwide's bank account in the Southern District of Florida.

33.     On or about April 28, 2003, **CAROL ARONOWITZ** and her co-conspirators caused Nationwide checks in the amount of $42,500, $500, $460, and $420 to be deposited into a bank account jointly held by **CAROL ARONOWITZ** and another person.

34.     In or about May 2003, **CAROL ARONOWITZ** had an interstate telephone conversation with potential purchaser K.H., during which she told K.H.. that she had several Internet kiosks, one was up and running, and she was on track to pay off her machine within a year.

35.     On or about May 13, 2003, a co-conspirator caused an investment check from K.H. in the amount of $14,995 to be deposited in Nationwide's bank account in the Southern District of Florida.

36.     On or about June 11, 2003, **CAROL ARONOWITZ** had an interstate telephone conversation with a potential purchaser of the Nationwide business opportunity.

37.     On or about July, 8, 2003, **CAROL ARONOWITZ** and her co-conspirators caused a Nationwide check in the amount of $17,500 to be deposited into a bank account jointly held by **CAROL ARONOWITZ** and another person.

All in violation of Title 18, United States Code, Section 1349.

12

## CRIMINAL FORFEITURE ALLEGATION
### (18 U.S.C. § 982; 21 U.S.C. § 853; 28 U.S.C. § 2461)

1.      The allegations contained in Count One of this Indictment are re-alleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeitures pursuant to Title 18, United States Code, Section 982(a)(8), and Title 28, United States Code, Section 2461(c).

2.      The defendant, **CAROL ARONOWITZ,** upon conviction for violating Title 18, United States Code Sections 1349, as alleged in Count 1 above, and upon a verdict that the offense involved telemarketing (as that term is defined in section 2325), shall forfeit to the United States any property, real or personal, constituting, and derived from, proceeds defendant obtained directly and indirectly as the result of such violation, to wit, the sum of $547,000, all in accordance with Title 18, United States Code, Section 982, and Title 28, United States Code, Section 2461, including but not limited to money in Huntington National Bank accounts: xxxxxxx0484, xxxxxxx8852, xxxxxxx4317, xxxxxxx1824, and xxxxxxx4828;

3.      If any of the forfeitable property described above, as a result of any act or omission of the defendant:

        (a)      cannot be located upon the exercise of due diligence;

        (b)      has been transferred, or sold to, or deposited with a third party;

        ( c )      has been placed beyond the jurisdiction of the Court;

        (d)      has been substantially diminished in value; or

        (e)      has been commingled with other property which cannot be subdivided without difficulty;

13

the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and by Title 28, United States Code, Section 2461( c ).

In accordance with Title 18, United States Code, Section 982; Title 21, United States Code, Section 853; and Title 28, United States Code, Section 2461.

A TRUE BILL

_____

FOREPERSON

_____
R. ALEXANDER ACOSTA
UNITED STATES ATTORNEY

_____
JOEL DAVID SCHWARTZ
TRIAL ATTORNEY
U.S. DEPARTMENT OF JUSTICE

14

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

vs.

CAROL ARONOWITZ,

Defendant.
_____/

CASE NO. _____

## CERTIFICATE OF TRIAL ATTORNEY*

Superseding Case Information:

Court Division: (Select One)

New Defendant(s)          Yes _____   No _____
Number of New Defendants  _____
Total number of counts    _____

_____ Miami    _____ Key West
__X__ FTL      _____ WPB      _____ FTP

I do hereby certify that:

1.   I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2.   I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3.   Interpreter:     (Yes or No)      __No__
     List language and/or dialect      _____

4.   This case will take    __10__   days for the parties to try.

5.   Please check appropriate category and type of offense listed below:

     (Check only one)                          (Check only one)

| | | | | | |
|---|---|---|---|---|---|
| I   | 0 to 5 days    | _____ | Petty   | _____ |
| II  | 6 to 10 days   | __X__   | Minor   | _____ |
| III | 11 to 20 days  | _____ | Misdem. | _____ |
| IV  | 21 to 60 days  | _____ | Felony  | __X__   |
| V   | 61 days and over | _____ | | |

6.   Has this case been previously filed in this District Court? (Yes or No)   __No__
If yes:
Judge: _____   Case No. _____
(Attach copy of dispositive order)
Has a complaint been filed in this matter?     (Yes or No)   __No__
If yes:
Magistrate Case No. _____
Related Miscellaneous numbers: _____
Defendant(s) in federal custody as of _____
Defendant(s) in state custody as of _____
Rule 20 from the _____   District of _____

Is this a potential death penalty case? (Yes or No)      __No__

7.   Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?   _____ Yes   __X__ No

8.   Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?   _____ Yes   __X__ No

JOEL D. SCHWARTZ
DOJ TRIAL ATTORNEY
Court No. A5501148

*Penalty Sheet(s) attached

REV 4/8/08

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name:**   Carol Aronowitz          **Case No:** _____

Count #:          1

_____ Conspiracy to Commit Mail Fraud and Wire Fraud _____

_____ 18 U.S.C. § 1349 _____

**\*Max Penalty**:      20 years' imprisonment _____

Count #:

_____

_____

**\*Max Penalty**: _____

Count #:

_____

_____

**\*Max Penalty:** _____

Count #:

_____

_____

**\*Max Penalty:** _____

**\*Refers only to possible term of incarceration, does not include possible fines, restitution, special assessments, parole terms, or forfeitures that may be applicable.**